# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE v. TERRELL LOVERSON

**Appeal from the Criminal Court of Shelby County**
**No. 10-03485    W. Mark Ward, Judge**

---

**No. W2011-02055-CCA-R3-CD  - Filed November 14, 2012**

---

Terrell Loverson ("the Defendant") was convicted by a jury of second degree murder, misdemeanor assault, and obstructing arrest.  After a sentencing hearing, the trial court sentenced the Defendant to an effective sentence of twenty-five years in the Tennessee Department of Correction.  In this appeal as of right, the Defendant challenges (1) the trial court's admission of a photograph of the victim; (2) the sufficiency of the evidence; and (3) his sentence.  After a thorough review of the record and relevant authorities, we have determined that the Defendant is not entitled to relief on any of these issues.  Accordingly, we affirm the trial court's judgments.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments
## of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ., joined.

Juni S. Ganguli (on appeal); Handel Durham and Samuel Perkins (at trial), Memphis, Tennessee, for the appellant, Terrell Loverson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Raymond J. Lepone and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was indicted in May 2010 for one count of first degree premeditated murder, one count of assault, and one count of obstructing arrest, all committed in February

2010, in Shelby County, Tennessee. At the Defendant's jury trial conducted in March 2011, the following proof was adduced:

Earl Jones, the security director for Southland Mall ("the Mall"), testified that he had twelve security guards working under him in February 2010, including the victim, Marques Rainey. The victim had been working at the Mall since May 2007. Jones described him as "a good employee, quiet, reliable. . . . He was a huge man but he was very quiet and he was educated." As part of their job, the security guards, including the victim, wore uniforms consisting of a gray long-sleeve shirt with "security" designated on each shoulder and black slacks. The guards did not carry weapons but did each carry a radio.

On Saturday, February 27, 2010, the victim reported for duty, in uniform, at 2:00 in the afternoon. Jones described the Mall as "very busy" at that time. Shortly after 2:00, another security guard called in an emergency at the north entrance of the Mall. Jones stated that all of the guards were responding to that location and that, shortly thereafter, "they just called officer down." By the time Jones arrived, a crowd had gathered. Jones found the victim "lying on the floor with a gunshot wound to his upper right chest." Jones stayed with the victim until the ambulance took him away.

Chantrice Rainey, the victim's wife, testified that they married in 2007. She identified a photograph of the victim taken on their wedding day.

Jerren Rutherford testified, identifying the Defendant at trial as his friend. On February 27, 2010, Rutherford and the Defendant went to the Mall to go shopping. They went in Rutherford's car and, after entering the Mall, went their "separate ways." Rutherford went to a shoe store and bought some shoes for his daughter. After he left the store, he saw the Defendant running toward one of the Mall exits. According to Rutherford, "[a]ll [of] a sudden security grabbed [the Defendant] and pinned him up against the wall and was holding him." Rutherford told the security guard, "[L]et my Nigga' go." At that point, Rutherford testified, the guard "let him go, like he barely let him go. He released because he thought I was going to hit him or something. I don't know. It was like he was scared, I don't know." After the guard let the Defendant go, Rutherford saw "a gun go off." Rutherford explained that, four or five seconds after the guard let the Defendant go, the Defendant shot the guard. Rutherford stated that the shooting "was real quick" and that he "didn't have time to stay [sic] stop or nothing. It was just so fast. It was like you couldn't like even try to stop it from happening." The Defendant fired one shot. Rutherford stated that, afterward, he stood there "in shock" and then he "ran to the car." The Defendant went with him, and they drove away together.

Rutherford testified that he had not known that the Defendant was armed. The Defendant still had the gun with him when the two men got in Rutherford's car. Rutherford

stated that the gun was black but that he did not know what kind of gun it was other than an "automatic." After they had driven several minutes, Rutherford dropped the Defendant off near "Ballenshire" in Memphis. The Defendant took his gun with him. Rutherford then went home. He did not call the police.

Rutherford later gave a statement to the police and identified a photograph of the Defendant in a photograph array. On the array, Rutherford wrote, "This is Terrell[,] this [is] who shot the security guard." Rutherford later learned that the incident had been videotaped by the Mall's security camera. He reviewed the video and acknowledged that it depicted what he saw. The video was admitted into evidence and played for the jury.

On cross-examination, Rutherford agreed that the security guard had thrown the Defendant "around like a rag doll." Rutherford wanted to stop the "man-handling" and told the guard to let the Defendant go. Rutherford testified that, after the guard let the Defendant go, and as the Defendant was backing up, the guard was "going after him again." At that point, the Defendant pulled a gun and shot the guard. According to Rutherford, the Defendant looked "like he had fear in his eyes."

Emory Hammonds testified that he worked in "the Barbershop" in the Mall, located across the aisle from Sweetness Sweets. Hammonds was at work on the 27th and, at about 2:30 that afternoon, he "heard like kind of like a rumbling, a lot of people running, a little commotion and you can tell it was coming from a little distant." He saw several "guys" running and "saw one guy hit a guy while they was running." Hammonds described the commotion as looking "like a gang fight." Then, he saw the victim "grab[] one guy by the arm and they kind of spun around." Hammonds then heard a "pow" and saw the victim rolling on the floor.

On cross-examination, Hammonds explained that the man that the victim grabbed was headed out of the Mall.

James Allen testified that he worked at the Barbershop in the Mall and that Hammonds was his boss. At about 2:30 in the afternoon of the 27th, he was at work and saw several "guys" running out of the Mall. He then saw "another group of guys," one of whom got into a "scuffle" with the victim. He saw the two men separate and then he "seen a gun raised up and pop pop and he got on out the mall."

Allen subsequently identified two men from photograph arrays, labeling one as "the guy that shot the man in the mall" and the other man as "with the shooter in the mall." Allen also identified the Defendant at trial as the shooter.

Oscar Quinn testified that he was working at the Barbershop when the victim was shot. He described what happened:

I just heard a lot of commotion going on at the entrance of the mall, and I stopped cutting hair and just walked up to the front entrance up to the door to see what was going on. And I just witnessed that some guys was fighting and security guard, you know, jumped between, you know, two suspects and decide to push one guy back and he retained one suspect and pinned him against the [wind] machine. Once he released him and I turned my head for a brief second, turned back and just witnessed a shot.

Quinn reiterated that the shooter fired the shot after he had been released by the victim. The shooter then ran out of the Mall. Quinn followed and saw him get in a car. A customer also went outside, got the tag number from a Maxima, and gave the number to Quinn. Quinn later turned the number over to the Memphis Police Department.

On cross-examination, Quinn again stated that the security guard got between two men and "pushed one suspect back and he grabbed the other guy back and held him for a second or two once he released him." The shooter was the person that the security guard grabbed and pushed against the wind machine, pinning him. After the guard released the shooter, the shot followed very quickly.

Tywaun Bonds identified the Defendant as someone he knew by the name "T-Bo." He also stated that he knew the Defendant to "hang out" with another individual he knew as "South Memphis." On the 27th, Bonds was in the Mall shopping. He "saw a group of folks standing in the middle of the mall and they got to fighting." He then saw "a lot of folks breaking out and running." The Defendant was one of the group of people fighting. When they ran toward the front entrance of the Mall, Bonds saw the security guard grab the Defendant. South Memphis ran up and said, "Let my Nigga' go, bitch." The security guard let the Defendant go. Bonds then heard a shot but did not see who fired it.

Bonds subsequently identified photographs of the Defendant and the man he knew as South Memphis from photograph arrays.

Justin Jenkins, eighteen years old at the time of trial, testified that he had been in the Mall at the time of the shooting. He was there with one of his "partners," Tywaun Bonds. While they were there, a "fight broke out." He said that two of the fighters were "South Memphis" and "T-Bo." He testified that "[e]verybody started running towards the front [of the Mall] and the security had grabbed T-Bo. And South Memphis told the man get up off of him and after that everybody ran out the mall after a shot was fired." Jenkins did not see who fired the shot. He later identified South Memphis and T-Bo from photograph arrays.

-4-

After a jury-out hearing, the State introduced the preliminary hearing testimony of Ellen Thomas, determined by the trial court to be unavailable to testify at trial. On February 27, 2010, Thomas was working at the Sweetness Sweets shop in the Mall. Her shop was across the aisle from the Barbershop. The "wind machine" was in the aisle of the Mall between the two shops. The machine was booth-like, designed for someone to stand in while it blew wind at 78 miles per hour.

On the day in question, she heard a "commotion" and told one of the other employees to pull down the "gate" across the front of the shop. As the other employee went to pull the gate down, Thomas said, "that's when [the victim] and the boy was wrestling, you know, and they had made it up there tumbling, you know, struggling with each other." By this time, "quite a few" people had already run past the shop to the door of the Mall.

Thomas stated that she was no more than ten feet away from the victim and the man with whom he was struggling. She explained what she saw:

> [The victim] and the guy was tussling and they made it up at the 78 wind machine. So [the victim] had subdued him up against the machine after they got through, you know, tussling with each other. [The victim] had him subdued up against this machine and then this other guy came up. And I'm going to assume that was his friend and he said he was talking to [the victim], he said oh punk ass nigger, let my partner go. And then [the victim] hesitated for a minute, you know, before he let him go and then he hesitated. He let him go and he the other guy who he had subdued up to the machine, you know, stepped back and he, you know, like, jumped back him and his partner.
>
> So his partner was on the right side of him and he was on the left side and they stepped back. And when he stepped back, [the victim] stepped to the side to get, you know – he was looking out the front door. He stepped right in front of our store. And when he stepped in front of our store, probably about five seconds later or something, the guy pulled the gun out and just shot him right there in the middle of the chest.

Thomas clarified that the person who pulled the gun was the person whom the victim had subdued. Thomas stated that one shot was fired and that the shooter then ran out the front entrance of the Mall. The shooter's partner also ran out of the Mall. Thomas added that, when the shooter pulled his gun and shot, the victim "was just standing there." Thomas was subsequently able to identify the shooter's partner, but not the shooter.

On cross-examination, Thomas described the victim as about six feet, one or two inches tall and "big." She stated that she did not know what happened between the victim

and the shooter prior to her seeing them struggling in front of her store. She did not see any other security guards at that time. She clarified that it was the victim who stepped back after letting the shooter go. She added that, after the victim let the shooter go, the shooter "bounced back with his partner" no more than ten feet.

Officer Christopher L. Gibson of the Memphis Police Department ("MPD") responded to the scene. He found the victim and attempted first aid. After medical personnel arrived, he secured the scene. Witnesses also were sequestered.

Officer Jeffrey Garey of the MPD Crime Scene Investigation Unit reported to the scene and took multiple photographs. He also composed a sketch of the Mall, indicating where certain items were found. He collected a spent bullet as well as several other items.

Officer Mark Jordan of the MPD testified that he received information that the Defendant was located at a house on Snyder in Shelby County. On March 1, 2010, he and several other officers went to the location to apprehend the Defendant. They surrounded the house, and one of the officers knocked. A woman answered the door and allowed the officers inside. They found the Defendant hiding in the attic. As they tried to apprehend the Defendant, the Defendant resisted and fought. As other officers moved the Defendant closer to Officer Jordan, the Defendant "balled up his right fist and punched [Officer Jordan] in the face." The Defendant subsequently kicked Officer Jordan before Officer Jordan was finally able to handcuff him.

On cross-examination, Officer Jordan stated that no photographs of his face were taken after the Defendant hit him and that he did not go to the hospital.

Sergeant Brad Webb of the MPD was provided with the license tag number that had been recovered at the scene and traced it to Jerren Rutherford. After the Defendant was taken into custody, Sgt. Webb and Sergeant Peel spoke with him. They advised the Defendant of his rights. The Defendant waived them, agreeing to give a statement. The Defendant told the officers that he had been at the Mall on the day in question and that a fight had broken out between members of his gang, the Goon Squad, and members of a rival gang, the Fam Mob. He stated that, as he was trying to get out of the Mall, another fight broke out and he heard a shot fired. He ran out of the Mall, got in a white Toyota, and left.

The officers advised the Defendant that they did not believe he was telling the truth and reminded him that the Mall had numerous video cameras.

In addition to interviewing the Defendant, Sgt. Webb took photographs of the Defendant's arms, showing his tattoos. These photographs were admitted into evidence. Sgt.

Webb explained that the tattoos included the words "Goon" and "Goon Squad Mafia," consistent with the Defendant's admission that he belonged to the Goon Squad gang.

Lieutenant Mark Miller of the MPD testified that he spoke with the Defendant after Sgts. Webb and Peel did. The Defendant asked Lt. Miller what he was being charged with, and Lt. Miller responded that "the charge on the arrest ticket was first degree murder." The Defendant then started talking about what had happened at the Mall, and Lt. Miller obtained a formal statement. The Defendant's written statement was admitted into evidence. In his written statement, the Defendant admitted responsibility for the victim's death; admitted that he went by "T-Bo"; stated that, while he and Jerren were at the Mall, "somebody swung, something about Fam Mob. I'm Goon Squad"; and explained the events as follows: "We was already running before the security guard came. A fight was in the front of the mall. Somebody just came and grabbed me from behind. I didn't know who it was. Then the gun went off and I left." The Defendant stated that the security guard grabbed him "[f]rom the neck from behind like in a choke hold. He ain't say nothing." At that point, the Defendant's gun was "[o]n [his] waist about to fall." The Defendant stated that he was carrying the gun, a 9 millimeter, because "this man told [him] somebody was gonna kill [him]." He added that the gun was currently "[i]n the woods somewhere." The Defendant described the distance from which he shot the victim as approximately four feet. He stated that he fired one shot. He also stated that he arrived at and left the Mall alone. He denied having heard Jerren say anything to the security guard.

Cervinia Braswell of the Tennessee Bureau of Investigation testified that she was "a special agent assigned as a forensic scientist to the Firearms Identification Unit." She examined the bullet recovered from the crime scene and determined that it was "a 9 millimeter caliber total metal jacket bullet."

Dr. Marco Ross, the Deputy Chief Medical Examiner for Shelby County, testified that he performed an autopsy on the victim. The victim was six feet, two inches tall and weighed 258 pounds. The victim had a gunshot wound to the chest. The bullet entered the victim's right upper chest and exited out the victim's back. In conjunction with performing the autopsy, several photographs of the victim were taken and admitted into evidence. Dr. Ross testified that the cause of death was "a gunshot wound of the chest." The manner of death was homicide.

The State rested its case after Dr. Ross' testimony. The defense put on no proof. The jury found the Defendant guilty of second degree murder (charged as a lesser-included offense of first degree premeditated murder), assault by provocative contact (charged as a lesser-included offense of assault by bodily injury), and obstructing arrest.

At the subsequent sentencing hearing, the victim's mother testified that the victim was twenty-eight years old when he died. He had a lot of family and friends. His death was hard on his family, and she was planning to start counseling as a result. She asked that, with regard to sentencing the Defendant, that "justice be done." Other than the presentence report, admitted without objection, no other proof was adduced at the sentencing hearing. The trial court determined that the Defendant was a Range I offender and applied four enhancement factors: the Defendant has a previous history of criminal convictions or criminal behavior in addition to that necessary to establish his Range; the Defendant employed a firearm during the commission of the offense; the Defendant was on bond at the time he committed the instant crimes and was subsequently convicted of the crime for which he was on bond; and the Defendant had been adjudicated to have committed a delinquent act as a juvenile that constituted a felony if committed by an adult. Defense counsel conceded the applicability of these enhancement factors. The trial court found as a mitigating factor that there had been "some physical contact" between the victim and the Defendant prior to the shooting. The trial judge also acknowledged the Defendant's expression of apology in the presentence report and stated that he would "give it the weight [to] which it's entitled." The trial court then imposed a sentence of twenty-five years for the second degree murder and six months for each of the other two misdemeanor offenses. The trial court ordered the sentences to be served concurrently.

The trial court subsequently denied the Defendant's motion for new trial, and this appeal followed. The Defendant challenges the trial court's admission of one of the autopsy photographs; the sufficiency of the evidence supporting his second degree murder conviction; and contends that his twenty-five year sentence for his second degree murder conviction is excessive. We will review each of these issues in turn.

## Analysis

*Admission of Autopsy Photograph*

The Defendant first contends that the trial court committed reversible error in admitting a photograph of the victim taken during the autopsy. The photograph is of the victim's face in profile and includes no depiction of any incisions or other invasive procedures. The Defendant argues that the photograph was not relevant and, further, that "even if this photograph had been relevant, its prejudicial nature substantially outweighed its probative value." We disagree on both points.

As our supreme court declared many years ago, "the admissibility of photographs lies within the discretion of the trial court whose ruling in this respect will not be overturned on appeal except upon a clear showing of an abuse of discretion." State v. Banks, 564 S.W.2d

947, 949 (Tenn. 1978); see also State v. Banks, 271 S.W.3d 90, app. 168 (Tenn. 2008). We discern no abuse of discretion in the trial court's admission of the challenged photograph.

In a murder trial, the State must prove that a victim was killed. In this case, the State introduced, without objection, a photograph of the victim while he was alive. This proof was admitted during Rainey's testimony. The photograph of the victim taken during the autopsy, admitted through Dr. Ross, permitted the jury to determine whether the victim about whom Rainey (and others) testified was the person who, in fact, had been killed. Therefore, we agree with the trial court that the photograph was relevant as corroborative proof of the victim's identity. See Tenn. R. Evid. 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

Moreover, the probative value of the photograph was not "substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. While the photograph depicts the victim as deceased, the photograph is in no way gruesome, nor does it show the victim's body "to be in an altered condition due to the autopsy." State v. Young, 196 S.W.3d 85, app. 129-30 (Tenn. 2006). The Defendant argues that the photograph "allowed the state to elicit an emotional response from the jury," but we disagree. The photograph merely corroborated other proof that the victim had been killed. The trial court did not abuse its discretion in admitting the photograph, and the Defendant is entitled to no relief on this issue.

### Sufficiency of the Evidence

The Defendant next challenges the sufficiency of the proof supporting his conviction of second degree murder. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our

Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2010). Our supreme court has determined that second degree murder is a "result of conduct" offense. See State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010); State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2010). Whether a defendant acts knowingly in killing another is a question of fact for the jury. Brown, 311 S.W.3d at 432 (citing State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000)). The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Inlow, 52 S.W.3d at 105; see also Brown, 311 S.W.3d at 432.

In this case, the proof demonstrated that the victim grabbed the Defendant as the Defendant was fleeing another altercation in the Mall. Rutherford came upon the two men and ordered the victim to release the Defendant. The victim did so. The Defendant then moved away, pulled out the pistol he brought into the Mall, and fired once at the victim, who was unarmed, striking the victim in his chest. The Defendant then ran out of the Mall and fled the premises.

This Court has recognized on numerous occasions that a jury is entitled to conclude that a defendant commits a knowing killing when he pulls a gun and fires it at a person. See, e.g., State v. Bobby L. Looper, No. M2011-01642-CCA-R3-CD, 2012 WL 3358155, at *8-9 (Tenn. Crim. App. Aug. 15, 2012) (evidence sufficient to support second degree murder where defendant aimed shotgun at unarmed victim and fired one shot, striking the victim in the chest); State v. Michael Raines, No. E2007-00840-CCA-R3-CD, 2008 WL 2152495, at *5 (Tenn. Crim. App. May 21, 2008) (evidence sufficient to support second degree murder where defendant pulled pistol and fired single shot at unarmed victim after victim threatened and then approached defendant). Here, the Defendant contends that the jury should have acquitted him on the basis of self-defense. This argument is without merit, given that the trial court refused to instruct the jury on self-defense, and the Defendant has raised no issue regarding the trial court's jury instructions. Accordingly, the Defendant has waived any argument that the jury should have considered the defense of self-defense. See Tenn. R. App. P. 27(a)(4) & (7); Tenn. Ct. Crim. App. R. 10(b); see also Bunch v. Bunch, 281 S.W.3d 406, 409-10 (Tenn. Ct. App. 2008) (refusing to consider issues not included in statement of

issues presented for review as required by Tennessee Rule of Appellate Procedure 27(a)(4)); State v. David G. Housler, No. M2002-00419-CCA-R3-CD, 2004 WL 367724, at *18-19 (Tenn. Crim. App. Feb. 27, 2004) (holding "without merit" issue not included in statement of issues, not briefed, and not supported by references to the record), aff'd, 193 S.W.3d 476 (Tenn. 2006).

The Defendant also contends that "there is simply not enough [evidence] to constitute proof beyond a reasonable doubt that he acted knowingly in shooting Officer Rainey." We disagree. The proof demonstrated that, after the unarmed victim let the Defendant go, the Defendant raised his 9 millimeter pistol and fired a shot at the victim from about four feet away, striking the victim in the chest and killing him. The jury had before it sufficient evidence from which to conclude that the Defendant's actions constituted a knowing killing. The Defendant is entitled to no relief on this issue.

*Sentencing*

In his final issue, the Defendant complains that a twenty-five year sentence for his second degree murder conviction is excessive. We disagree.

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010). The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where

-11-

reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates that,

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010). Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).[1]

---

[1] Our legislature has mandated that sentences for second degree murder be served in confinement at one hundred percent, i.e., without eligibility for release on parole. See Tenn. Code Ann. § 40-35-501(i)(1) & (2)(B) (2010).

-12-

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, __ S.W.3d ___, ___, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at __, *20. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts. (2010); see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In this case, the trial court determined that the Defendant is a Range I offender. The Range I sentence for second degree murder, a Class A felony,[2] is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (2010). The trial court then determined that four enhancement factors applied: "(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; "(9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense"; "(13) At the time the felony was committed, . . . the defendant . . . [was] [r]eleased on bail or pretrial release, if the defendant is ultimately convicted of the prior misdemeanor or felony"; and "(16) The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." Tenn. Code Ann. § 40-35-114(1), (9), (13), (16) (2010). Defense counsel conceded the applicability of all of these enhancement factors at the sentencing hearing. In mitigation, the trial court considered that there had been some physical contact between the Defendant and the victim shortly before the Defendant shot the victim. The trial court also recognized that the Defendant's version of the offense as set forth in the presentence report provided as follows: "I just like to say I'm sorry for every thing that happen and that I never meant for it to happen I apologize to the court and the family and my family as well. I feel like I do deserve some kind of punishment." The court declined to afford much (if any) weight to this mitigating factor, however, because the Defendant "doesn't want to get up here and tell anybody he's remorseful."

After considering the appropriate sentencing principles and purposes, the evidence before it, the applicable enhancing and mitigating factors, and the circumstances of the offense, the trial court imposed the maximum sentence of twenty-five years. The Defendant

---

[2] See Tenn. Code Ann. § 39-13-210(c).

complains that the trial court "did not begin its analysis of [his] sentence at the minimum of Range One" and "placed undue emphasis on [his] failure to apologize for his conduct at the sentencing hearing." However, upon our close and careful review of the record, including the transcript of the sentencing hearing, we discern no abuse of discretion by the trial judge in imposing the maximum sentence for the Defendant's second degree murder conviction. The Defendant's sentence for his second degree murder conviction is within the appropriate range and the record demonstrates that the sentence is in compliance with the purposes and principles of the Sentencing Act. Accordingly, the Defendant is entitled to no relief on this basis.

## Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.


_____
JEFFREY S. BIVINS, JUDGE